Chief Judge Fuld.
The defendant, Loral Corporation, seeks to recover payment for goods delivered under a contract which it had with plaintiff Austin Instrument, Inc., on the ground that the evidence establishes, as a matter of law, that it was forced to agree to an increase in price on the items in question under circumstances amounting to economic duress.
In July of 1965, Loral was awarded a $6,000,000 contract by the Navy for the production of radar sets. The contract contained a schedule of deliveries, a liquidated damages clause applying to late deliveries and a cancellation clause in case of default by Loral. The latter thereupon solicited bids for some *129 40 precision gear components needed to produce the radar sets, and awarded Austin a subcontract to supply 23 such parts. That party commenced delivery in early 1966.
In May, 1966, Loral was awarded a second Navy contract for the production of more radar sets and again went about soliciting bids. Austin bid on all 40 gear components but, on July 15, a representative from Loral informed Austin’s president, Mr. Krauss, that his company would be awarded the subcontract only for those items on which it was low bidder. The Austin officer refused to accept an order for less than all 40 of the gear parts and on the next day he told Loral that Austin would cease deliveries of the parts due under the existing subcontract unless Loral consented to substantial increases in the prices provided for by that agreement—both retroactively for parts already delivered and prospectively on those not yet shipped— and placed with Austin the order for all 40 parts needed under Loral’s second Navy contract. Shortly thereafter, Austin did, indeed, stop delivery. After contacting 10 manufacturers of precision gears and finding none who could produce the parts in time to meet its commitments to the Navy,[1] Loral acceded to Austin’s demands; in a letter dated July 22, Loral wrote to Austin that “We have feverishly surveyed other sources of supply and find that because of the prevailing military exigencies, were they to start from scratch as would have to be the cáse, they could not even remotely begin to deliver on time to meet the delivery requirements established by the Government. * * * Accordingly, we are left with no choice or alternative but to meet your conditions. ’ ’
Loral thereupon consented to the price increases insisted upon by Austin under the first subcontract and the latter was awarded a second subcontract making it the supplier of all 40 gear parts for Loral’s second contract with the Navy.[2] Although Austin was granted until September to resume deliveries, Loral did, in fact, receive parts in August and was able to produce the radar sets in time to meet its commitments to the Navy on both contracts. After Austin’s last delivery under the second subcontract *130 in July, 1967, Loral notified it of its intention to seek recovery of the price increases.
On September 15, 1967, Austin instituted this action against Loral to recover an amount in excess of $17,750 which was still due on the second subcontract. On the same day, Loral commenced an action against Austin claiming damages of some $22,250 — the aggregate of the price increases under the first subcontract — on the ground of economic duress. The two actions were consolidated and, following a trial, Austin was awarded the sum it requested and Loral’s complaint against Austin was dismissed on the ground that it was not shown that “it could not have obtained the items in question from other sources in time to meet its commitment to the Navy under the first contract.” A closely divided Appellate Division affirmed (35 A D 2d 387). There was no material disagreement concerning the facts; as Justice Stetjer stated in the course of his dissent below, “ [t]he facts are virtually undisputed, nor is there any serious question of law. The difficulty lies in the application of the law to these facts. ” (35 A D 2d 392.)
The applicable law is clear and, indeed, is not disputed by the parties. A contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will. (See Allstate Med. Labs. v. Blaivas, 20 N Y 2d 654; Kazaras v. Manufacturers Trust Co., 4 N Y 2d 930; Adams v. Irving Nat. Bank, 116 N. Y. 606, 611; see, also, 13 Williston, Contracts [3d ed., 1970], § 1603, p. 658.) The existence of economic duress or business compulsion is demonstrated by proof that “ immediate possession of needful goods is threatened ” (Mercury Mach. Importing Corp. v. City of New York, 3 N Y 2d 418, 425) or, more particularly, in cases such as the one before us, by proof that one party to a contract has threatened to breach the agreement by withholding goods unless the other party agrees to some further demand. (See, e.g., du Pont de Nemours & Co. v. Hass Co., 303 N. Y. 785; Gallagher Switchboard Corp. v. Heckler Elec. Co., 36 Misc 2d 225; see, also, 13 Williston, Contracts [3d ed., 1970], § 1617, p. 705.) However, a mere threat by one party to breach the contract by not delivering the required items, though wrongful, does not in itself constitute economic duress. It must also appear that *131 the threatened party could not obtain the goods from another source of supply[3] and that the ordinary remedy of an action for breach of contract would not be adequate.[4]
We find without any support in the record the conclusion reached by the courts below that Loral failed to establish that it was the victim of economic duress. On the contrary, the evidence makes out a classic case, as a matter of law, of such duress.[5]
It is manifest that Austin’s threat — to stop deliveries unless the prices were increased — deprived Loral of its free will. As bearing on this, Loral’s relationship with the Government is most significant. As mentioned above, its contract called for staggered monthly deliveries of the radar sets, with clauses calling for liquidated damages and possible cancellation on default. Because of its production schedule, Loral was, in July, 1966, concerned with meeting its delivery requirements in September, October and November, and it was for the sets to be delivered in those months that the withheld gears were needed. Loral had to plan ahead, and the substantial liquidated damages for which it would be liable, plus the threat of default, were genuine possibilities. Moreover, Loral did a substantial portion of its business with the Government, and it feared that a failure to deliver as agreed upon would jeopardize its chances for future contracts. These genuine concerns do not merit the label ‘‘' self-imposed, undisclosed and subjective ’ ’’which the Appellate Division majority placed upon them. It was perfectly reasonable for Loral, or any other party similarly placed, to consider itself in an emergency, duress situation.
*132 Austin, however, claims that the fact that Loral extended its time to resume deliveries until September negates its alleged dire need for the parts. A Loral official testified on this point that Austin’s president told him he could deliver some parts in August and that the extension of deliveries was a formality. In any event, the parts necessary for production of the radar sets to be delivered in September were delivered to Loral on September 1, and the parts needed for the October schedule were delivered in late August and early September. Even so, Loral had to “work * * * around the clock” to meet its commitments. Considering that the best offer Loral received from the other vendors it contacted was commencement of delivery sometime in October, which, as the record shows, would have made it late in its deliveries to the Navy in both September and October, Loral’s claim that it had no choice but to accede to Austin’s demands is conclusively demonstrated.
We find unconvincing Austin’s contention that Loral, in order to meet its burden, should have contacted the Government and asked for an extension of its delivery dates so as to enable it to purchase the parts from another vendor. Aside from the consideration that Loral was anxious to perform well in the Government’s eyes, it could not be sure when it would obtain enough parts from a substitute vendor to meet its commitments. The only promise which it received from the companies it contacted was for commencement of deliveries, not full supply, and, with vendor delay common in this field, it would have been nearly impossible to know the length of the extension it should request. It must be remembered that Loral was producing a needed item of military hardware. Moreover, there is authority for Loral’s position that nonperformance by a subcontractor is not an excuse for default in the main contract. (See, e.g., McBride & Wachtel, Government Contracts, § 35.10, [11].) In light of all this, Loral’s claim should not be held insufficiently supported because it did not request an extension from the Government.
Loral, as indicated above, also had the burden of demonstrating that it could not obtain the parts elsewhere within a reasonable time, and there can be no doubt that it met this burden. The 10 manufacturers whom Loral contacted comprised its entire list of " approved vendors ’ ’ for precision gears, and none was *133 able to commence delivery soon enough.[6] As Loral was producing a highly sophisticated item of military machinery requiring parts made to the strictest engineering standards, it would be unreasonable to hold that Loral should have gone to other vendors, with whom it was either unfamiliar or dissatisfied, to procure the needed parts. As Justice Steuer noted in his dissent, Loral “ contacted all the manufacturers whom it believed capable of making these parts ” (35 A D 2d, at p. 393), and this was all the law requires.
It is hardly necessary to add that Loral’s normal legal remedy of accepting Austin’s breach of the contract and then suing for damages would have been inadequate under the circumstances, as Loral would still have had to obtain the gears elsewhere with all the concomitant consequences mentioned above. In other words, Loral actually had no choice, when the prices were raised by Austin, except to take the gears at the “coerced” prices and then sue to get the excess back.
Austin’s final argument is that Loral, even if it did enter into the contract under duress, lost any rights it had to a refund of money by waiting until July, 1967, long after the termination date of the contract, to disaffirm it. It is true that one who would recover moneys allegedly paid under duress must act promptly to make his claim known. (See Oregon Pacific R. R. Co. v. Forrest, 128 N. Y. 83, 93; Port Chester Elec. Constr. Corp. v. Hastings Terraces, 284 App. Div. 966, 967.) In this case, Loral delayed making its demand for a refund until three days after Austin’s last delivery on the second subcontract. Loral’s reason—for waiting until that time-—is that it feared another stoppage of deliveries which would again put it in an untenable situation. Considering Austin’s conduct in the past, this was perfectly reasonable, as the possibility of an application by Austin of further business compulsion still existed until all of the parts were delivered.
In sum, the record before us demonstrates that Loral agreed to the price increases in consequence of the economic duress *134 employed by Austin. Accordingly, the matter should be remanded to the trial court for a computation of its damages.
The order appealed from should be modified, with costs, by reversing so much thereof as affirms the dismissal of defendant Loral Corporation’s claim and, except as so modified, affirmed.

. The best reply Loral received was from a vendor who stated he could commence deliveries sometime in October.

. Loral makes no claim in this action on the second subcontract.

. See, e.g., du Pont de Nemours & Co. v. Hass Co., 303 N. Y. 785, supra; Gallagher Switchboard Corp. v. Heckler Elec. Co., 36 Misc 2d 225, 226, supra; 30 East End v. World Steel Prods. Corp., 110 N. Y. S. 2d 754, 757.

. See, e.g., Kohn v. Kenton Assoc., 27 A D 2d 709; Colonie Constr. Corp. v. De Lollo, 25 A D 2d 464, 465; Halperin v. Wolosoff, 282 App. Div. 876; J. R. Constr. Corp. v. Berkely Apts., 259 App. Div. 830; Boss v. Hutchinson, 182 App. Div. 88, 92.

. The suggestion advanced that we are precluded from reaching this determination because the trial court’s findings of fact have been affirmed by the Appellate Division ignores the question to be decided. That question, undoubtedly one of law (see Cohen and Karger, Powers of the New York Court of Appeals [1952], § 115, p. 492), is, accepting the facts found, did the courts below properly apply the law to them.

. Loral, as do many manufacturers, maintains a list of “ approved vendors,” that is, vendors whose products, facilities, techniques and performance have been inspected and found satisfactory.